**COMMONWEALTH of Pennsylvania, Appellant,**

v.

**Ruba JACKSON, Appellee.**

Superior Court of Pennsylvania.

Argued April 17, 2002.
Filed Oct. 11, 2002.

Kelly Kline, Asst. Dist. Atty., Reading, for Commonwealth, appellant.

Emmanuel H. Dimitriou, Reading, for appellee.

Before: JOYCE, BECK and POPOVICH, JJ.

OPINION BY POPOVICH, J.:

¶ 1 The Commonwealth appeals the order granting the pretrial motion to suppress and writ of habeas corpus of Ruba Jackson/Appellee. We affirm.

¶ 2 The facts, as is herein relevant and recited in the suppression court's opinion, show the following events leading to the present appeal; to-wit:

> ... Sometime during Saturday, May 26, 2000, Mrs. Jill Kraemer, a postal worker for the Mohnton Post Office, supposedly first noticed a tape recorder which had been on the Defendant's ... desk for years. The Defendant is ... the Postmaster for the Mohnton Post Office....
>
> Mrs. Kraemer opened the tape recorder and discovered that it contained a

cassette with her name displayed on the outside of the tape. Mrs. Kraemer played the cassette and recognized a recent conversation that had occurred between the Defendant and her. Mrs. Kraemer summoned two (2) employees to listen to the cassette and disclosed to them that her conversation with the Defendant had been taped without her permission. After Mrs. Kraemer discovered the audio cassette with her name written on the outside of it, she conducted a further search of the Defendant's closed desk drawer and discovered additional audio cassettes. A complaint regarding the Defendant's cassettes was filed with the postal worker's union, and the union then notified Mr. Andrew Katerman, the designated Postal Inspector for Berks County. Mr. Katerman received the complaint on June 13, 2000 and immediately contacted his supervisor, Mr. Bill Burmeister. Mr. Burmeister informed Mr. Katerman that there was no interest in federal prosecution or a further investigation of this matter.

On June 29, 2000, Mrs. Kraemer reported to Trooper Barry L. Whitmoyer of the Pennsylvania State Police that she was being taped without her approval. On June 20, 2000, Trooper Whitmoyer visited the Mohnton Post Office and with the assistance of Postal Inspector Andrew Katerman conducted a warrantless search of Defendant's desk. Trooper Whitmoyer recovered two (2) audio cassettes which contained conversations with three (3) different postal employees in addition to Mrs. Kraemer. Shortly thereafter, the Defendant was arrested and scheduled for a Preliminary Hearing.

A Preliminary Hearing was held ... [and t]he Defendant ... was bound over to court for four (4) counts of Interception, Disclosure, or Use of Wire, Electronic, or Oral Communications, 18 Pa.

C.S.A. § 5703. The Defendant was arraigned....

Following arraignment, ... the Defendant ... filed an Omnibus Pretrial Motion ... [and] a Petition for a Writ of Habeas Corpus, Suppression of Physical Evidence and Statements.... After hearing testimony, ... th[e] court issued Findings of Fact and Conclusions of Law which suppressed the illegally seized evidence and granted the Defendant's request for a Writ of Habeas Corpus.

Suppression Court Opinion, 6/8/01, at 1–3. Thereafter, the Commonwealth filed an appeal raising the following issues:

1. THE TRIAL COURT ERRED IN SUPPRESSING ANY TAPES OR EVIDENCE FOUND BY JILL KRAEMER OR ANY OTHER EMPLOYEE OF THE MOHNTON POST OFFICE IN THE DEFENDANT'S OFFICE WHEN LAW ENFORCEMENT HAD NO PART IN THE SEARCH.

2. THE TRIAL COURT ERRED IN SUPPRESSING ANY TAPES OR EVIDENCE FOUND BY POSTAL INSPECTOR ANDREW KATERMAN IN THE DEFENDANT'S OFFICE SINCE THE POSTMASTER HAD NO EXPECTATIONS OF PRIVACY IN THE AREAS SEARCHED.

3. THE TRIAL COURT ERRED IN CONCLUDING THAT THE COMMONWEALTH FAILED TO ESTABLISH A *PRIMA FACIE* CASE FOR THE CHARGES AGAINST THE DEFENDANT AND, THEREFORE, ERRED IN GRANTING *HABEAS CORPUS* RELIEF.

Appellant's Brief at i.

¶ 3 Before addressing the merits of the Commonwealth's claims, we need to

assure ourselves that the case is properly before us as dictated by our Supreme Court in *Commonwealth v. Dugger*, 506 Pa. 537, 486 A.2d 382 (1985), which held that, as a condition precedent to accepting an appeal from the Commonwealth's challenge of an order granting a motion to suppress, the Commonwealth must make a good faith certification that a suppression order terminates or substantially handicaps its prosecution.

¶ 4 Consistent with *Dugger* and its progeny, we have scrutinized the record and present in the Commonwealth's "Notice of Appeal" is a statement that the prosecution's case is "substantially handicapped" or likely to "terminate" with the entry of the suppression order. This preserves our ability to review the appeal of the order granting the motion to suppress. *Contrast Commonwealth v. Slovikosky*, 374 Pa.Super. 441, 543 A.2d 553, 555 (1988)(". . . the Commonwealth's appeal of that portion of the court's order granting the defendant's motion to suppress is quashed for non-compliance with *Dugger*.") Therefore, the appeal of that portion of the April 17, 2001, order assailing the grant of the motion to suppress is reviewable.

■ ¶ 5 Where the Commonwealth appeals the adverse decision of a suppression court, we must consider only the evidence of defense witnesses and so much of the prosecution's evidence as remains uncontradicted. *Commonwealth v. Dewar*, 449 Pa.Super. 517, 674 A.2d 714, 716 (1996). If "the evidence supports the factual findings, we are bound by such findings; a reviewing court may only reverse if the legal conclusions drawn therefrom are in error." *Commonwealth v. Fahy*, 512 Pa. 298, 516 A.2d 689, 694-695 (1986).

¶ 6 In the present case, the evidence presented by the Commonwealth does not establish that the two cassettes seized from the postmaster's desk-drawer were seized solely at the insistence of the postal inspector (Andrew Katerman). On the contrary, Mr. Katerman was acting at the direction of State Trooper Whitmoyer, who first contacted the postal inspector that "he had received information that there may be evidence of a crime inside the Mohnton Post Office." N.T., 12/05/00, at 25-26. This prompted the postal inspector, in the company of the state trooper, to enter Appellee's office and search for any evidence reflective of the commission of a crime without a warrant.

■ ¶ 7 The strictures of the Fourth Amendment, applied to the States through the Fourteenth Amendment, have been applied to the conduct of governmental officials in various civil activities. *New Jersey v. T.L.O.*, 469 U.S. 325, 334-335, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985). Stated otherwise, searches and seizures by government employers or supervisors of the private property of their employees are subject to the restraints of the Fourth Amendment. *See O'Connor v. Ortega*, 480 U.S. 709, 714, 107 S.Ct. 1492, 94 L.Ed.2d 714 (1987), wherein the United States Supreme Court granted *certiorari* to assess the perimeters of a hospital's warrantless search of its employee/Dr. Ortega's office. Ortega was on paid administrative leave during an investigation of charges of professional misconduct involving fellow staff members. In reviewing the decision of the Court of Appeals for the Ninth Circuit, the *Ortega* Court wrote in pertinent part:

> Within the workplace context, this Court has recognized that employees may have a reasonable expectation of privacy against intrusions by police. *See Mancusi v. DeForte*, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968). As with the expectation of privacy of one's home, such an expectation in one's place of work is "based upon societal expectations that have deep roots in the

history of the Amendment." *Oliver v. United States, supra,* 466 U.S. at 178, n. 8, 104 S.Ct. 1735. Thus, in *Mancusi v. DeForte, supra,* the Court held that a union employee who shared an office with other union employees had a privacy interest in the office sufficient to challenge successfully the warrantless search of that office:

"It has long been settled that one has standing to object to a search of his office, as well as of his home.... [I]t seems clear that if DeForte had occupied a 'private' office in the union headquarters, and union records had been seized from a desk or a filing cabinet in that office, he would have had standing.... In such a 'private' office DeForte would have been entitled to expect that he would not be disturbed except by personal or business invitees, and that records would not be taken except with his permission or that of his union supervisors." 392 U.S. at 369, 88 S.Ct. 2120.

Given the societal expectations of privacy in one's place of work expressed in both *Oliver* and *Mancusi,* we reject the contention ... that public employees can never have a reasonable expectation of privacy in their place of work. Individuals do not lose Fourth Amendment rights merely because they work for the government instead of a private employer. The operational realities of the workplace, however, may make *some* employees' expectations of privacy unreasonable when an intrusion is by a supervisor rather than a law enforcement official.

＊　＊　＊　＊　＊　＊

The Court of Appeals concluded that Dr. Ortega had a reasonable expectation of privacy in his office, and five Members of this Court agree with that determination. ＊ ＊ ＊ But, regardless of any

legitimate right of access the Hospital staff may have had to the office as such, we recognize that the undisputed evidence suggests that Dr. Ortega had a reasonable expectation of privacy in his desk and file cabinets.

480 U.S. at 416–419, 107 S.Ct. 1187 (Emphasis in original).

■ ¶ 8 Here, the Commonwealth's evidence established that State Trooper Whitmoyer approached Appellee's supervisor to advise him he "may" have information that evidence of a crime was contained in Appellee's office. In the trooper's company, the postal inspector accessed the post office on a Saturday through the rear door, then the two entered Appellee's private room. This was followed by a joint search of Appellee's entire office before the trooper uncovered two audio cassettes in Appellee's desk drawer, which are the subject of this appeal.

¶ 9 In line with *Ortega,* we hold that Appellee's right to privacy, *i.e.,* freedom from unreasonable searches and seizures, was not compromised when she became employed by the postal authorities, nor was there any written procedural policy submitted by the Commonwealth which dissuades us from that conclusion. *See* Suppression Court Opinion, 6/28/01, at 7–8; *see also Ortega,* 480 U.S. at 718, 107 S.Ct. 1492. Further, no evidence was presented by the Commonwealth indicating that "exigent" circumstances existed excusing the securement of a warrant by the State Trooper in advance of the search and seizure of Appellee's private property from her desk drawer. *See Commonwealth v. Eliff,* 300 Pa.Super. 423, 446 A.2d 927, 935 (1982)(In the presence of "exigent" circumstances a warrantless search may hurdle the ultimate test of avoiding condemnation via the Fourth Amendment as "unreasonable."); *Commonwealth v. Gibson,* 536 Pa. 123, 638 A.2d 203, 206 (1994)(Semble).

¶ 10 Accordingly, Appellant's claim (No. 2) seeking a reversal of the suppression of evidence by Trooper Whitmoyer and Postal Inspector Katerman is found to be specious.[1]

¶ 11 Likewise, the appeal of that portion of the April 17, 2001, order questioning the grant of Appellee's writ of habeas corpus is suspect. We begin with *Commonwealth v. Morman*, 373 Pa.Super. 360, 541 A.2d 356 (1988), wherein it is written in relevant part:

> ... As a starting point, we must recognize the importance and history of the writ of habeas corpus in our system of government. "The writ of habeas corpus has been called the 'great writ.' It is an ancient writ, inherited from the English common law, and lies to secure the immediate release of one who is detained unlawfully."
>
> *    *    *    *    *    *
>
> The writ of habeas corpus exists to vindicate the right of personal liberty in the face of unlawful government deprivation.
>
> *    *    *    *    *    *
>
> ... The purpose of a preliminary hearing is much the same as the purpose of the pretrial petition for habeas corpus relief. As has often been stated:
>
> > The primary reason for the preliminary hearing is to protect an individual's right against unlawful arrest and detention. It seeks to prevent a person from being imprisoned or required to enter bail for a crime which was never committed, or for a crime

with which there is no evidence of his connection....

*    *    *    *    *    *

> ... We find that the scope of evidence which a trial court may consider in determining whether to grant a pretrial writ of habeas corpus is *not* limited to the evidence as presented at the preliminary hearing. On the contrary, we find that the Commonwealth may present additional evidence at the habeas corpus stage in its effort to establish at least *prima facie* that a crime has been committed and that the accused is the person who committed it.
>
> *    *    *    *    *    *
>
> ... In the pretrial setting, the focus of the habeas corpus hearing is to determine whether sufficient Commonwealth evidence exists to require a defendant to be held in government "custody" until he may be brought to trial. To make this determination, the trial court should accept into evidence the record from the preliminary hearing as well as any additional evidence which the Commonwealth may have available to further prove its *prima facie* case.

*Morman*, 541 A.2d at 358–360 (Citations omitted; emphasis in original).

■ ¶ 12 Further, at a habeas corpus hearing, the Commonwealth need not produce evidence of such character and quantum of proof as to require a finding by a

---

1. Appellant's argument (No. 1) that the audio cassette tapes found by Appellee's co-employee Jill Kraemer are not suppressible is meritless.

The tapes found by Kraemer in Appellee's desk were returned to the same location. *See* N.T., 12/05/00, at 13. Consequently, as noted quite correctly by the suppression court, "the chain of custody of the cassette tapes did not begin with Mrs. Kraemer but with Trooper Whitmoyer after he removed the tapes from the Defendant's bottom drawer." Trooper Whitmoyer's actions under a Fourth Amendment analysis, discussed in response to the Commonwealth's No. 2 issue, responds appropriately to the No. 1 issue and need not be repeated here.

jury of the accused's guilt beyond a reasonable doubt. But it should be such as to present "sufficient probable cause to believe, that the person charged has committed the offense stated[.]" *Commonwealth ex rel. Scolio v. Hess*, 149 Pa.Super. 371, 374, 27 A.2d 705, 707 (1942) (Citations omitted).

■ ¶ 13 Applying such precepts here, we hold the Commonwealth's failure to prevail in its challenge of the suppression order inhibits our ability to review the grant of the writ of habeas corpus. As stated by the court below on this point, it:

> ... did not address the **prima facie** elements of the charged crimes because the evidence was successfully suppressed and everything obtained as a result of the illegally obtained evidence [wa]s also suppressed according to the "fruits of the poisonous tree" doctrine. Without the evidence of the two (2) audio cassettes, the Commonwealth's case was insufficient to meet their burden and satisfy all of the required elements under the statute.[2]

Suppression Court's Opinion, 6/28/01, at 9. We agree.

¶ 14 On February 13, 2001, a hearing was conducted to evaluate the merits of Appellee's petition for writ of habeas corpus and motion to suppress (tapes seized without warrant by Pennsylvania State Trooper Whitmoyer). The transcript of the preliminary hearing was admitted without objection at the February 13th hearing, which produced but one witness (Ms. Encarnacion) who recalled seeing a tape recorder on Appellee's desk for the six years that she cleaned the office.

¶ 15 A review of the preliminary hearing transcript reveals the testimony of a Ms. Kraemer, Mr. Weik, Ms. Maillie and Ms. Landis, all employees working under the postmaster (Appellee) in the Mohnton post office. Ms. Maillie testified to reading a transcript of a tape seized by Trooper Whitmoyer from Appellee's office, but the content related to a co-worker and not her. As for the other three employee/witnesses, each gave an account of being tape recorded, without their knowledge or consent, by Appellee. However, and this is key, their knowledge of the tape recordings originated with, or were the product of, the tapes in the possession of Trooper Whitmoyer, which were suppressed by the court below. *See, e.g.*, Reproduced Record at 25a, 32a & 40a; Suppression Court Opinion, 6/28/01, at 2 ("Trooper Whitmoyer recovered two (2) audio cassettes which contained conversations with three (3) different postal employees in addition to Mrs. Kraemer.")

¶ 16 Weik, Maillie and Landis had no independent knowledge of being taped by Appellee absent a review of the transcripts of the tapes seized from Appellee's office, all of which was suppressed by the court below and affirmed by this Court on appeal, which undermines the Commonwealth's efforts to reverse the suppression

---

**2.** Appellee was charged with four counts of violating 18 Pa.C.S.A. § 5703(1), which reads in relevant part:

> **§ 5703. Interception, disclosure or use of wire, electronic or oral communication.**
> Except as otherwise provided in this chapter, a person is guilty of a felony of the third degree if he:
>
> (1) intentionally intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept any wire, electronic or oral communication....
>
> The statute defines "oral communication" in Section 5702 as:
>
> Any oral communication uttered by a person possessing an expectation that such communication is not subject to intercep-

and habeas corpus order.[3]

¶ 17 Order affirmed.

¶ 18 BECK, J. files a Concurring and Dissenting Opinion.

## CONCURRING AND DISSENTING OPINION BY BECK, J.:

¶ 1 I agree with the majority that the warrantless search of appellee Jackson's desk was a violation of the Fourth Amendment, thus requiring suppression of the evidence seized as a result of the search, *i.e.*, the tapes and any other evidence gained by their seizure. However, I do not agree that the habeas court acted properly in discharging Ms. Jackson. Rather, I believe that even without the tapes, the record establishes a prima facie case against Ms. Jackson, which requires that she face trial on the charges lodged against her.

¶ 2 Where a criminal defendant seeks to challenge the sufficiency of evidence presented at her preliminary hearing, she may do so by filing a writ of habeas corpus with the court of common pleas. *Commonwealth v. McBride*, 528 Pa. 153, 595 A.2d 589, 590 n. 2 (1995). *See also Commonwealth v. Saunders*, 456 Pa.Super. 741, 691 A.2d 946 (proper means for challenging pretrial finding that Commonwealth has made out a prima facie case is petition for writ of habeas corpus), *appeal denied*, 550 Pa. 703, 705 A.2d 1307 (1997). In such instances, the habeas court acts in the capacity of a reviewing court to assess whether a prima facie case was presented at the preliminary hearing, that is, wheth-

er sufficient evidence exists to require the defendant to be brought to trial. *Commonwealth v. Scott*, 396 Pa.Super. 339, 578 A.2d 933, 936–37 (1990), *appeal denied*, 528 Pa. 629, 598 A.2d 283 (1991). The standard is clear: the Commonwealth establishes a prima facie case when it produces evidence that, *if accepted as true*, would warrant the trial judge to allow the case to go to a jury. *Commonwealth v. Marti*, 779 A.2d 1177, 1180 (Pa.Super.2001).

¶ 3 In this case, Ms. Jackson combined her suppression motion with her request for habeas relief. After it ruled that the tapes were inadmissible, the habeas court considered the remaining evidence against Ms. Jackson and concluded that it fell short of establishing a prima facie case. The habeas court reasoned: "Without the evidence of the two (2) audio cassettes, the Commonwealth's case was insufficient to meet their [sic] burden to satisfy all of the required elements under the statute." Trial Court Opinion, 6/28/01, at 9. The majority apparently agrees, relying on the fruit of the poisonous tree doctrine to find that all of the witnesses' "knowledge of the tape recordings originated with, or were the product of, the tapes in the possession of Trooper Whitmoyer, which were suppressed." Majority Opinion at 10–11. While this is true of some of the witnesses that appeared at the preliminary hearing, it is not true of all of them.

¶ 4 The majority correctly concludes that the testimony of those witnesses who relied on police-prepared transcripts is tainted and therefore inadmissible. Plain-

tion under circumstances justifying such expectation.

**3.** The Commonwealth would have us hold the mere oral testimony of its witnesses to the existence of the tape recorder in Appellee's office, without the production of some physical evidence that the illegal "intercept" occurred—*i.e.*, the tapes, is sufficient to hold the

matter for court. We find that said testimony, in and of itself, falls short of the **prima facie** evidence necessary to establish a violation of 18 Pa.C.S.A. § 5703(1) allowing the case to be held for court. *See Morman*, supra (discussing the level of proof necessary to create a **prima facie** case).

ly, that testimony was given as a direct result of the illegally seized tapes. Because those tapes were subject to suppression, all evidence that emanated from them likewise must be suppressed. However, both the habeas court and the majority have neglected to consider other relevant evidence presented at the preliminary hearing, evidence that was untainted by the illegal seizure.

¶ 5 Jill Kraemer testified that she discovered the tapes in Ms. Jackson's desk. observed her name and others on them and listened to them. She described hearing her own voice and Jackson's engaged in conversations that Kraemer remembered having with the postmaster. She also testified that she did not give permission to be recorded and was not aware that she was being recorded. Ms. Kraemer's observations neither originated with nor were the product of Trooper Whitmoyer's subsequent, illegal seizure.

¶ 6 Further, Ms. Kraemer and several other employees testified to statements made by Ms. Jackson at an office-wide meeting, wherein she admitted that she taped conversations with employees and was aware that she might lose her job as a result. These statements, admissions by the accused, neither originated with nor were the product of Trooper Whitmoyer's subsequent, illegal seizure.

¶ 7 Ms. Kraemer's testimony, along with that of the other employees who testified about Ms. Jackson's statements, were not only admissible but were also sufficient to establish a prima facie case under 18 Pa. C.S.A. § 5703(1). This evidence, if believed, established that Ms. Jackson recorded conversations she had with her employees without their permission. As a result, the habeas court erred in concluding that appellee was entitled to a discharge.

¶ 8 The habeas court's further comments regarding its assessment of the case, including Ms. Jackson's purported reasons for making the tapes and the question of whether the tape recorder was in plain view on Ms. Jackson's desk, are simply irrelevant. Neither the credibility of the witnesses presented nor the validity of any claimed defenses is of any concern when determining if a prime facie case is present. *See Liciaga v. Court of Common Pleas*, 523 Pa. 258, 566 A.2d 246, 248 (1989) (preliminary hearing magistrate not empowered to make credibility determinations). *See also Marti, supra* (Commonwealth establishes prima facie case when it produces evidence that, *if accepted as true*, would warrant the trial judge to allow the case to go to a jury; weight and credibility are not factors). Thus, it was neither necessary nor appropriate for the habeas court judge to make such findings at that stage in the proceedings.

¶ 9 Because I believe there is sufficient evidence to constitute a prima facie case under 18 Pa.C.S.A. § 5703(1), even without the tapes seized by Trooper Whitmoyer, I would find that the trial court erred in granting appellee habeas relief. As a result, I would affirm that part of the trial court's order suppressing the tapes and any fruits thereof. In addition, I would reverse that part of the trial court's order granting habeas relief and would remand the case for trial on all charges.